# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Frederick J. Kapala | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 13 C 50041 | **DATE** | 2/28/2013 |
| **CASE TITLE** | Seaga Manufacturing, Inc. v. Intermatic Manufacturing, Ltd., et al. | | |

**DOCKET ENTRY TEXT:**

Plaintiff's motion for a temporary restraining order [4] is denied.

■ [ For further details see text below.]

Docketing to mail notices.

---

Plaintiff, Seaga Manufacturing, Inc., has sued defendants, Intermatic Manufacturing, Ltd. ("Intermatic Europe"), Intermatic Manunfacturing, Inc. ("Intermatic USA," collectively with Intermatic Europe as "Intermatic"), and Intermatic Europe's principal Robert John Cecil "David" Hawthorne, for breach of contract. Currently before the court is plaintiff's motion for a temporary restraining order ("TRO"), seeking an injunction requiring defendants to specifically perform on the contract with plaintiff pending a preliminary injunction hearing seeking the same for the remainder of the litigation. The TRO was requested after notice to the defendants and resulted in two days of hearings. For the reasons that follow, the motion for a TRO is denied.

## I. BACKGROUND

Hawthorne is an Irish citizen who allegedly owns the intellectual property necessary to create automatic cotton candy vending machines. After a customer places the required amount of money in the cotton candy machine, it purportedly creates the cotton candy in front of the customer and wraps it around a paper handle which dispenses automatically to the customer, all without the need for a live attendant. Hawthorne licenses this intellectual property to his company Intermatic Europe, which sells the machines. Intermatic Europe has a distribution contract with Sega Amusements Europe Limited[1] ("SA"), an international company who is purportedly a "large player in the amusement industry" (Compl. ¶ 51), whereby SA has agreed to purchase cotton candy machines from Intermatic Europe and distribute them. Intermatic Europe, in turn, provides a license for the machines' intellectual property to Intermatic USA, a wholly-owned subsidiary of Intermatic Europe.

On January 6, 2012, Intermatic USA entered into a contract with plaintiff to manufacture the cotton candy machines. That contract guaranteed that Intermatic USA would purchase 600 cotton candy machines from plaintiff in the first year of the agreement. After that, the parties were to negotiate the number of machines to be purchased each additional year, for at least five years. The contract also obligated plaintiff to accept purchase orders from Intermatic USA or any other entity Intermatic USA designates as one of its customers. According to the parties, SA was designated as one of the customers under the contract, and SA almost immediately sent a purchase order to plaintiff for two hundred machines to be filled in several lots.

Plaintiff was unable to fill the order in the requested time. Despite considerable effort from defendants and plaintiff, plaintiff only successfully shipped seventy-two machines in the first year in two lots of thirty-six.

The relationship between plaintiff and defendants rapidly deteriorated during that first year, as SA sent more requests to plaintiff that could not be filled within SA's time frame. In August 2012, the parties exchanged letters demanding reasonable assurances under the UCC that the other would perform. Specifically, plaintiff sent a letter alleging, among other things, that defendants had breached the contract by failing to provide the necessary, up to date, drawings and schematics to manufacture the machines and by making many changes to the machines that did not match the drawings plaintiff was provided without following the procedure for requesting changes laid out in the contract. Defendants responded by alleging, among other things, that plaintiff was in breach of the contract because it was plaintiff, not defendants, who had made unauthorized changes to the machines. By December 2012, the relationship between the parties had completely broken down and defendants sent a letter to plaintiff which purported to terminate the contract based on plaintiff's alleged breaches and ordered the plaintiff to ship all remaining completed machines immediately and discontinue manufacture. Thereafter, defendants instructed the supplier of some of the electronics necessary for successful manufacture of the machines to cease providing the electronics to plaintiff.

On February 8, 2013, plaintiff filed a three-count complaint against defendants. In Count I, plaintiff claims breach of contract against defendants. In Count II, plaintiff seeks a declaratory judgment against defendants related to the same contract. In Count III, plaintiff seeks to have all defendants, including Hawthorne and Intermatic Europe who are not parties to the contract, held jointly and severally liable through an alter-ego theory of liability. Plaintiff also filed a Motion for Temporary Restraining Order and Preliminary Injunction against defendants pursuant to Rule 65 of the Federal Rules of Civil Procedure, seeking injunctive relief. Based on the motion, the court held two days of hearings.

As of the hearing on February 15, 2013, plaintiff, despite the December 2012 letter, retained (or possibly manufactured afterwards, the record is unclear) a third lot of thirty-six completed machines ready for shipment.[2] Additionally, plaintiff had completed a fourth lot of thirty-six additional machines, but those machines lacked necessary electronics to make the machines work. As part of its injunctive relief, plaintiff requests that this court (1) enjoin defendants from interfering with plaintiff's purchase orders from its suppliers and component manufacturers, (2) order defendants to provide the intellectual property, dongles, programming software, drawings, blueprints, schematics, samples and/or bills of material necessary to manufacture the cotton candy vending machines (collectively "the drawings") so that plaintiff can perform under the contract, and (3) order defendants to withdraw any intellectual property holds on plaintiff's suppliers and component manufacturers so that plaintiff can perform under the contract.

In addition, plaintiff asserts that the contract provides that defendants will exclusively purchase the cotton candy machines from plaintiff. However, in late January 2013, Intermatic Europe publicly held out another company, Nitronica, as its "exclusive manufacturer" at an amusement industry trade show in the United Kingdom. Accordingly, as its final request for injunctive relief, plaintiff asks that this court enter an order (4) enjoining defendants from purchasing the cotton candy vending machines from any other vendor.

The contract states, and both parties agree, that Illinois law controls this dispute.

## II. ANALYSIS[3]

### A. Standard of Review

In order to justify the imposition of a TRO, the moving party must demonstrate (1) a reasonable likelihood of success on the merits, (2) no adequate remedy at law, and (3) irreparable harm absent the injunction. See Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health, 699 F.3d 962, 972 (7th Cir. 2012). "If it makes this threshold showing, the district court weighs the balance of harm to the parties if the injunction is granted or denied and also evaluates the effect of an injunction on the public interest." Id.

However, a TRO, like a preliminary injunction, "is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). Indeed, a TRO "may only be awarded upon a

clear showing that the plaintiff is entitled to such relief." Id. at 22. Here, plaintiff essentially seeks specific performance of the contract, which is itself "an exceptional remedy and is normally available only when damages constitute an inadequate remedy." TAS Distrib. Co. v. Cummins Engine Co., 491 F.3d 625, 637 (7th Cir. 2007). "Furthermore, specific performance is rarely an appropriate remedy where such a grant would mandate ongoing supervision by the court." Id.

### B. Reasonable Likelihood of Success on the Merits

The first consideration in determining whether to issue a TRO is always whether the movant has shown a reasonable likelihood of success on the merits of its claim. See Coronado v. Valleyview Pub. Sch. Dist. 365-U, 537 F.3d 791, 795 (7th Cir. 2008). In order to do so, plaintiff "must show that it has a better than negligible chance of success on the merits of at least one of its claims." Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc., 549 F.3d 1079, 1096 (7th Cir. 2008) (quotation marks omitted). "This is an admittedly low requirement and is simply a threshold question." Id. However, "[t]he strength of the moving party's likelihood of success on the merits affects the balance of harms. The more likely it is that the moving party will win its case on the merits, the less the balance of harms need weigh in its favor." Planned Parenthood, 699 F.3d at 972 (alteration and quotation marks omitted). Under Illinois law, in order to win on the merits of plaintiff's breach of contract claim, plaintiff must prove "(1) the existence of a valid and enforceable contract; (2) plaintiff's performance of all required contractual conditions; (3) defendant's breach of the terms of the contract; and (4) damages resulting from the breach." Lindy Lu LLC v. Ill. Cent. R.R. Co., 2013 IL App (3d) 120337, ¶21. Only the second and third prongs are at issue in this case.

Plaintiff has made the requisite low threshold showing that it has more than a negligible chance of success based on the written record and the hearings, but at this point in the case has not made a particularly strong showing over and above the minimum threshold. Although plaintiff alleged a number of breaches against defendants, the main issue on the merits at this point appears to be determining which party, plaintiff or defendants, breached the contract. Plaintiff alleged that defendants breached the contract early in the parties' relationship by failing to provide the drawings as required by the contract and by requiring numerous unauthorized changes to the drawings which affected the time and quality of manufacture. As evidence, plaintiff provided an affidavit, and then live testimony, from Steven Chesney, plaintiff's CEO, who testified in a knowledgeable and credible manner as to each of plaintiff's claims. The court finds that, based on the record currently before the court, the ultimate finder of fact could believe Chesney's testimony and find that defendants breached the contract. However, defendants presented evidence indicating that it was plaintiff that breached, thereby relieving defendants of any further duty to perform under the contract. Specifically, defendants claimed that it was plaintiff that made the unauthorized modifications and that plaintiff had been provided with a complete set of the drawings which it had chosen to change on its own. As proof, defendants offered an affidavit, followed by live testimony, from David Clements, the Vice President of Intermatic USA, who also testified in a knowledgeable and credible manner as to defendants' claims. There is extrinsic evidence in the record that tends to support Chesney's allegations, but also extrinsic evidence that supports Clements' claims. There is no evidence which persuasively establishes which story is true. At this point, based only on the written submissions and testimony from Chesney and Clements, the court is unable to say with any certainty who would win in what largely amounts to a credibility contest before the jury concerning which party breached the contract.

Furthermore, plaintiff's fourth request for injunctive relief requires that it prove that the contract provided plaintiff the exclusive right to manufacture the cotton candy machines for defendants. Section 1.1 of the contract states that "INTERMATIC hereby agrees to purchase from SEAGA and SEAGA agrees to sell to INTERMATIC with world-wide exclusivity, those products identified . . . ." It is clear that the phrase "with world-wide exclusivity" applies to the second clause where "SEAGA agrees to sell to INTERMATIC." What is less clear is whether the phrase "with world-wide exclusivity" also applies to the first clause where "INTERMATIC hereby agrees to purchase from SEAGA." Accordingly, the contract is clear that plaintiff is only permitted to sell the cotton candy machines to Intermatic or its designees, but it is less clear if Intermatic is obligated to use plaintiff

as its exclusive manufacturer. Chesney testified that the parties understood this language to be a mutual obligation of exclusivity during negotiations, therefore providing parol evidence that plaintiff's reading—that the "with world-wide exclusivity" applies to both clauses of section 1.1—is the correct interpretation. However, section 1.3 of the contract, which provides that Intermatic grants to plaintiff "a non-exclusive, royalty-free, irrevocable right and license" to use Intermatic's drawings and intellectual property for the production of the machines, supports defendants' reading of section 1.1—that Intermatic is not obligated to use plaintiff as its exclusive manufacturer—by providing only a non-exclusive right to the intellectual property necessary to manufacture the machines. Either reading is reasonable in context, and, therefore, the term is ambiguous. See Rexnord Corp. v. Am. Empl'rs Ins. Co., 2012 IL Ap (2d) 111025-U, ¶ 18 ("[I]f the contract is susceptible to more than one reasonable interpretation, it is ambiguous."). Accordingly, the court again finds that, because there is some parol evidence from Chesney creating a better than negligible chance that a fact finder could determine that plaintiff's reading is the correct one, plaintiff has met its low threshold burden. However, because the document itself is ambiguous and could sensibly be read to support defendants' position, the court again finds that at this point int eh proceedings the likelihood of success on the merits does not provide plaintiff with much additional support beyond the threshold requirement.

### C. Adequate Remedy at Law and Irreparable Harm

"In every case in which the plaintiff wants a [TRO] he must show that he has no adequate remedy at law, and . . . that he will suffer irreparable harm if the [TRO] is not granted." Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 386 (7th Cir. 1984). "The absence of an adequate remedy at law is a precondition to any form of equitable relief." Id. "The requirement of irreparable harm is needed to take care of the case where although the ultimate relief that the plaintiff is seeking is equitable, implying that he has no adequate remedy at law, he can easily wait till the end of trial to get that relief." Id. "Only if he will suffer irreparable harm in the interim—that is, harm that cannot be prevented or fully rectified by the final judgment after trial—can he get a preliminary injunction. " Id. However, "Illinois courts have consistently held that money damages are the appropriate remedy for breach of contract." Ill. Beta Chapter of Sigma Phi Epsilon Fraternity Alumni Bd. v. Ill. Inst. of Tech., 409 Ill. App. 3d 228, 232 (2011) (quotation marks omitted). "Injunctive relief is disfavored where the gravamen of a complaint is breach of contract and the trial court could award damages if it found a breach occurred." Id.

Here, although acknowledging that this is a breach of contract case, plaintiff nevertheless alleges that it will suffer two related irreparable harms unless the court enters the TRO. Specifically, the plaintiff alleges (1) that defendants' violation of the exclusivity provision and its holding out of Nitronica as its exclusive manufacturer will cause a loss of reputation and goodwill in the close knit vending machine manufacturing business and (2) that the loss of reputation and goodwill with SA in particular by forcing plaintiff to fail to fulfill SA's purchase order is an irreparable harm, given the size and importance of SA in the vending machine industry. Plaintiff is correct that violations of exclusivity agreements and loss of goodwill are the kind of harms that can be considered irreparable. See, e.g., Ace Am. Ins. Co. v. Wachovia Ins. Agency Inc., 306 F. App'x 727, 731 (3d Cir. 2009) ("ACE asserts that the proposed asset sale will irreparably harm it by causing a loss of its goodwill and reputation as a result of losing its status as the exclusive underwriter of the E–Risk business. Although in certain situations a loss of goodwill may be irreparable, that is not the case here."). However, in this case, plaintiff has not yet shown that the loss is of the "immediate" and "substantial" nature necessary to justify the imposition of a preliminary specific performance remedy in what is otherwise just a breach of contract case. See Chavez v. Ill. State Police, No. 94 CV 5307, 1996 WL 66136, at *6 (N.D. Ill. Feb. 13, 1996) ("A plaintiff has a threshold requirement to plead facts sufficient for the court to conclude that 'substantial and immediate irreparable injury' will occur if injunctive relief is not granted.").

Turning to plaintiff's first argument, that it will lose goodwill and reputation industry-wide if defendants are permitted to hold out Nitronica as the exclusive manufacturer, plaintiff has not set out how the future harm here is either immediate or substantial, even assuming that it prevails on its argument that the contract has an

exclusivity clause. Indeed, Chesney testified that Intermatic has already gone to a major amusement industry expo and held out Nitronica as its exclusive manufacturer. If the vending machine industry is as close knit as plaintiff claims, then the damage has already been done, and now, assuming a breach is eventually proved, that damage needs to be quantified into damages. Injunctive relief can only prevent future harm, it can do nothing to remedy past errors. See Smith v. Allen, 502 F.3d 1255, 1269 (11th Cir. 2007) ("[I]njunctive relief is prospective in nature, intended to prevent future injuries . . . ." (quotation marks omitted)) abrogated on other grounds by Sossamon v. Texas, 131 S. Ct. 1651 (2011). Additionally, the court finds unconvincing plaintiff's claims that the industry will automatically assume that defendants replaced plaintiff because plaintiff failed to perform, or failed to perform up to an acceptable standard of quality. Clements testified that Intermatic has had other manufacturers over the past few years for these machines and there is no evidence that any of these manufacturers suffered a loss of goodwill or reputation when Intermatic took its business elsewhere. Indeed, the court notes that both parties agreed that the most recent, and prolific, of Intermatic's manufacturers—Grand Products—recently filed a lawsuit against Intermatic USA. In that lawsuit, Intermatic USA counterclaimed, arguing that, much like its argument in this suit, Grand Products failed to produce some of the machines up to Intermatic's standards. Despite that, there is no evidence that Grand Products has seen a significant dip in its reputation or goodwill within the industry. The court is aware that there are many reasons that companies switch manufacturers and, without more than plaintiff's bald assertion, the court is unwilling to simply assume that the entire industry will somehow know of defendants' claims and hold them against plaintiff prior to the imposition of final judgment.

Moving on, then, to plaintiff's second argument, that it will lose goodwill and reputation with SA in particular (which Chesney described as the "800-pound gorilla") by failing to meet the purchase order,[4] the court is again unpersuaded. First, it appears from the record that plaintiff does not have much of a reputation with SA to save. In an email dated February 21, 2013, the managing director of SA, who is apparently equivalent to the CEO of the company, sent Chesney a warning that all seventy-two of the machines from the first two lots have functioned poorly and that SA would seek to return all seventy-two machines and would cancel the purchase order if plaintiff was unable to remedy the problem within two weeks. It is hard to imagine that any additional loss of goodwill for failure to fill the remainder of the two hundred unit purchase order would be sufficiently substantial to justify injunctive relief, in light of the current problems. To the extent that loss of goodwill has been caused by defendants, as plaintiff claims, that loss can be calculated as damages, but, again, injunctive relief is designed to deal with immediate prospective injury not with injury that has already occurred. Furthermore, and more importantly, it is clear from the same letter that SA is well aware of the ongoing dispute and the fact that plaintiff claims the fault lies with Intermatic. Plaintiff admits that it has no other currently ongoing business with SA and that its only contact with SA is through the contract with Intermatic. Should Plaintiff ultimately prevail in this dispute and prove that defendants were the cause of the problem by way of their breach, it is unclear how or why any future dealings between plaintiff and SA would be affected.

Based on the foregoing, the court finds that plaintiff has not met its burden to show that it would suffer immediate and substantial irreparable harm absent the imposition of a TRO. Therefore, especially in light of the extraordinary relief of specific performance requested in plaintiff's motion, the court finds that injunctive relief is not appropriate at this time.

Having determined that the plaintiff has not met its burden to show irreparable harm, the court need go no further to discuss whether plaintiff has shown that it has no adequate remedy at law. However, because this case is scheduled to go to a preliminary injunction hearing where the plaintiff is likely to raise the same, or similar, arguments to those raised here, the court will address plaintiff's major contention as to this point, namely that defendants are insolvent, or nearly insolvent, and thus plaintiff cannot adequately recover monetary damages against the defendants. Although money damages are typically the correct form of damages in a breach of contract case, see Ill. Beta Chapter of Sigma Phi Epsilon, 409 Ill. App. 3d at 232, insolvency can be a grounds for finding that no adequate remedy at law exists, see Roland Mach. Co., 749 F.2d at 386 ("A damages remedy

can be inadequate for any of four reasons: . . . . (c) Damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected."). So far in this case, however, there is insufficient evidence of insolvency to warrant a finding that no adequate remedy at law exists. At the hearings, and in the parties' submissions, there is some evidence that Intermatic Europe's financial position is precarious.[5] However, Intermatic Europe is not a party to the contract directly and will only be held liable if plaintiff succeeds on its alter-ego theory of liability. Plaintiff's contract is with Intermatic USA, and the evidence concerning Intermatic USA's financial health is scarce. Clements testified that the income from Intermatic USA handled the day-to-day operations, but that the company received distributions from Intermatic Europe to handle special outlays. He also testified that Intermatic USA did not have sufficient cash on hand to meet a different judgment against the company for over $200,000. However, no testimony addressed any capital assets which Intermatic USA may hold which could be attached to satisfy a future judgment in this case or the existence, or lack thereof, of some form of liability insurance. Additionally, there is no evidence in the record at all that David Hawthorne, the third defendant, is insolvent or in danger of becoming insolvent. Should plaintiff win in its alter-ego arguments and hold Hawthorne jointly liable, there is no evidence that he would be unable to fully satisfy any judgment. Accordingly, plaintiff has not carried its burden to show that it has no adequate remedy at law based on insolvency.

At the preliminary injunction hearing, the parties should be prepared to deal with each issue identified in this order, as well as any other issue the parties feel is pertinent. Specifically, the parties should be prepared to discuss whether the purchase orders from SA to plaintiff created an independent contract between SA and plaintiff. Additionally, the parties should be prepared to offer evidence as to the current status of the purchase orders and whether SA has given any indication as to whether it still wishes to do business with plaintiff.

Because plaintiff has not met the threshold showings, the court need not address the balance of harms to the parties or the public interest in the injunction, but will, instead, defer that analysis to the preliminary injunction stage should plaintiff succeed in making the threshold showing. See Planned Parenthood of Ind., 699 F.3d at 972.

### III. CONCLUSION

Based on the foregoing, plaintiff's motion for a temporary restraining order is denied.

---

1. Despite the similarity in name, Sega Amusements Europe Limited and plaintiff Seaga Manufacturing, Inc., are not related companies outside of the contractual relationships described herein.

2. According to the testimony at the February 15, 2013 hearing, the third lot of thirty-six machines was scheduled to be shipped before the February 22, 2013 hearing. However, at the February 22, 2013 hearing, there was no mention of whether that shipment had actually been sent.

3. For simplicity, and for the purposes of this motion only, the court will refer to Intermatic USA, Intermatic Europe, and Hawthorne as simply "defendants" the way plaintiff does. This usage is not to imply that Intermatic Europe or Hawthorne have waived any arguments concerning personal jurisdiction or whether they are bound to the contract in the first place, as neither of those arguments needs to be resolved to dispose of the instant TRO motion.

4. At the hearings, the court inquired from the parties as to whether the purchase orders created a separate binding contract between plaintiff and SA which plaintiff is now in danger of being forced to breach. Plaintiff asserted that the purchase orders created independent contracts while defendants

asserted that they did not, however no party provided this court with any legal argument or evidence to support their positions until plaintiff and defendant Intermatic USA filed motions for leave to file memorandum of law with attached exhibits days after the hearing while this order was being prepared. In fairness to all of the parties, this court denied those motions and will limit itself to materials presented at the hearings and to the written submissions filed in preparation for those hearings Accordingly, because plaintiff bears the burden of proof at this stage and the record is insufficient to determine the question of the purchase orders, the court will treat the purchase orders as though they do not create separate binding contracts. However, the parties are welcome to address this question again at the preliminary injunction stage.

5. The court notes, but does not address, defendants' argument that Intermatic Europe's insolvency cannot be used by plaintiff to find an inadequate remedy at law because it was caused by plaintiff's breach of the contract. The court's discussion of the current content of the record is not intended to imply that this argument has been waived or rejected, and the parties are encouraged to address this argument at the preliminary injunction stage as necessary.